**UNUM LIFE INSURANCE COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 87–0354 P.

United States District Court, D. Maine.

March 2, 1989.

Barbara H. Furey, Asst. Counsel, UNUM Life Ins. Co., Portland, Me., for plaintiff.

David R. Collins, Asst. U.S. Atty., Portland, Me., and Chris Kleifoth, Trial Atty. Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

GENE CARTER, District Judge.

Plaintiff UNUM [1] is a life insurance company organized under the laws of the State of Maine. UNUM brings this action challenging the collection of federal income tax deficiencies from UNUM for the calendar years 1977 and 1978, in the amounts of $2,630,303 and $2,747,840, respectively, as a result of an audit by the Internal Revenue Service. UNUM is subject to taxation under sections 801–820 of the Internal Revenue Code of 1954, as amended (the Code), 26 U.S.C. §§ 801–820 (1970), which sections were added to the Code by the Life Insurance Company Income Tax Act of 1959, 73 Stat. 112. *See Union Mutual Life Insurance Co. v. United States*, 420 F.Supp. 1181 (D.Me.1976), *aff'd in part and rev'd in part*, 570 F.2d 382 (1st Cir.), *cert. denied*, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978).

1. UNUM adopted its current name on November 14, 1986 when it converted from a mutual to a stock form of ownership. In 1977 and 1978, the years in question in this matter, Plaintiff's corporate name was Union Mutual Life Insurance Company. The Court refers to Plaintiff as UNUM throughout this opinion in the interests of clarity.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. section 1346(a)(1). The case was tried before the Court, sitting without a jury, and counsel has briefed and argued this action fully. The Court makes the following findings of fact and conclusions of law.

## I. INTRODUCTION

The 1959 Act divides the calculation of an insurance company's taxable income into three distinct phases. Phase I computes the taxable portion of the company's investment income, its "taxable investment income." Code sections 804–806. Phase II computes the "underwriting gain," focusing on the company's gain or loss. Code sections 809–812. Phase III computes the company's taxable income as it concerns certain distributions to stockholders. Code section 815. After each phase's computation is complete, taxable income is computed under Code section 802(b) to be the sum of (1) the lesser of Phase I or Phase II income; (2) 50% of the excess, if any, of Phase II income over Phase I income; and (3) Phase III taxable income, if any. The sum thus calculated is then taxed at the normal corporate rate. *Union Mutual Life Insurance Co. v. United States*, 420 F.Supp. at 1185.

The issues presented in this case relate solely to the calculations required for the Phase I determination of taxable investment income. The Phase I computations are intended to divide the company's investment income into two parts, one of which is nontaxable and the other taxable. The nontaxable portion of investment income is that which is allocable to reserves held to meet the company's obligations to policyholders. The balance is the taxable portion available to the company for other purposes. *Union Mutual Life Insurance Co. v. United States*, 420 F.Supp. at 1185.

The Phase I computation of nontaxable policyholder share of investment income begins with a calculation of "policy and other contract liability requirements." Code section 804(a). Section 805(a) defines "policy and other contract liability requirements" as the sum of (1) the adjusted life insurance reserves, multiplied by the adjusted reserves rate, (2) the mean of the pension plan reserves at the beginning and end of the taxable year, multiplied by the current earnings rate, and (3) the interest paid. To arrive at the nontaxable policyholder share of investment income, the "policy and other contract liability requirements," calculated as the sum of life insurance reserves, pension plan reserves, and interest paid, are divided by the taxpayer's investment income after expenses. The result is the percentage of the company's net investment income to be set aside as the nontaxable policyholder's share. Section 804(a).

The dispute now before the Court centers around UNUM's calculation of its "policy and other contract liability requirements" under Code section 805(a).[2] Specifically, UNUM claims that a certain Deposit Fund Liability, described *infra*, should not be considered a "pension plan reserve" as this term is defined in Code section 805(d). If the Deposit Fund Liability is determined to be a pension plan reserve, then interest UNUM paid to that Fund will be determined by multiplying the average amount of that Fund during the year in question by the average rate of return UNUM earned on its assets during that year. Code section 805(a)(2). If, on the other hand, the Deposit Fund Liability is not considered a pension plan reserve, then UNUM can deduct all amounts actually paid in interest to the Deposit Funds in the determination of its nontaxable investment income under Code section 805(a)(3). In arguing that the Deposit Fund Liability is not a pension plan reserve, UNUM is seeking a full deduction for the interest it actually paid to the Fund

**2.** Code section 805(a) provides:
(a) In general. For purposes of this part, the term "policy and other contract liability requirements" means, for any taxable year, the sum of—
(1) the adjusted life insurance reserves, multiplied by the adjusted reserves rate,

(2) the mean of the pension plan reserves at the beginning and end of the taxable year, multiplied by the current earnings rate, and
(3) the interest paid.

in the calculation of its nontaxable investment income, rather than a deduction based on UNUM's average rate of return earned and the Fund's average balance for the years in question.

The Code section 805(d) definition of a pension plan reserve begins by saying that the term means "that portion of the life insurance reserves" which is allocable to specific types of contracts. Thus, according to the Code, in order for a specific fund to be a pension plan reserve, it must first be a life insurance reserve. It is UNUM's position that the Deposit Fund Liability is not a life insurance reserve, and is, therefore, not a pension plan reserve.

Code section 801(b) sets forth the definition of a life insurance reserve. To meet the definition of a life insurance reserve, an amount must be (a) computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interests, and (b) set aside to mature or liquidate future unaccrued claims.[3] Unless the Deposit Fund Liability meets both of the Code section 801(b) requirements, the Fund is not a life insurance reserve. And, unless the Fund is a life insurance reserve, it cannot be a pension plan reserve for purposes of calculating UNUM's taxable and nontaxable investment income.

## II. FINDINGS OF FACT AND ANALYSIS

During the years 1977 and 1978, UNUM had in force certain group annuity contracts which were issued to employers and other qualified pension plans to fund retirement benefits for their employees and other participants. While these contracts varied somewhat in their terms, they are similar in that the contract holder could deposit sums of money with UNUM in an account termed the "Deposit Fund" or the "Fund." The contracts gave the contract holder the right to withdraw sums of money from the Deposit Fund at its discretion, to be applied by UNUM to certain specified purposes. Among these purposes could be to pay a lump sum benefit directly to plan participants or employees, or to purchase an annuity for a retired plan participant or employee.

The Deposit Fund functioned, in fact, very much like a simple bank savings account. The terms of the contracts determined the amount of interest that UNUM would pay on the Deposit Fund balance. Interest was paid periodically, either monthly or daily, at the rate established in the individual contract. The contract also permitted UNUM to deduct established administration costs and certain expense charges. The balance of the Deposit Fund was determined on a periodic basis by taking the sum of all deposits made by the contract holder, adding all interest credits earned, and deducting all administration charges and withdrawals. The contract holder received periodic written statements reflecting these changes in the Deposit Fund balance. The aggregate of each of these contract Deposit Fund balances is known as the Deposit Fund Liability.

The Deposit Fund served as an account out of which contract holders could purchase benefits or annuities for its plan participants or employees. The Deposit Fund's balance was entirely discretionary to the contract holder. The contract holders could direct a lump sum payment out of the Fund to plan participants or employees, or could direct the use of Fund monies to purchase an annuity for a retired participant or employee. In addition, the contract holders had discretion in determining the amount of the deposits to the Deposit Fund. Some contracts obligated the contract holders to deposit all Fund contributions within a minimum to maximum range,

---

**3.** Code section 801(b)(1) provides:

(1) In general. For purposes of this part, the term "life insurance reserves" means amounts—

(A) which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and

(B) which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts (including life insurance or annuity contracts combined with noncancellable health and accident insurance) involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies.

while others left the contributions entirely to the contract holders' discretion. In most cases, UNUM made no representations regarding the sufficiency of the Fund to provide the benefits the pension plan might be required to provide.[4]

In addition, the contract holder was entitled to terminate the contract and demand a distribution of the Deposit Fund. In such circumstances, the contracts provided that UNUM could retain a certain amount of the disbursement of the Fund balance. This charge, which varied according to the contract and manner of disbursement in range up to 6% of the Fund balance, was known as the "load."[5] The load, in effect, is profit retained by UNUM in the event that the contract holder withdraws funds from the Deposit Fund.

It is the Government's argument that the aggregate of these Deposit Funds, known as the Deposit Fund Liability, meets the requirements of the definition of "life insurance reserve" under Code section 801(b), which are that the reserve must be computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and also must be set aside to mature or liquidate future unaccrued claims. As stated above, a failure to meet the Code section 801(b) definition of life insurance reserves means that the Deposit Fund Liability cannot be a pension plan reserve, thus permitting UNUM to deduct all amounts actually paid as interest to the Deposit Funds in the determination of its nontaxable income under Code section 805(a)(3).

On the evidence produced at trial, the Court finds that UNUM's Deposit Fund Liability does not meet the Code definition of life insurance reserves. No mortality or morbidity tables were used in computing or estimating the amount of UNUM's Deposit Fund Liability in each year as that amount appears as "Deposit Administration Funds" in UNUM's annual statements for the years 1977 and 1978. As discussed above, the Deposit Fund Liability was mechanically calculated similarly to a typical bank account. UNUM credited deposits made by the contract holders, deducted withdrawals made at the contract holder's discretion, credited interest to the individual Deposit Fund balances on a periodic basis and deducted administration and other expense charges. UNUM's Deposit Fund Liability is equal to the amount it holds in the Deposit Funds at a given time, less the load as described above. No mortality or morbidity factor was used in calculating the load, nor in determining the interest to be credited to the Deposit Funds.

The Government argues that UNUM's calculation does not give the full picture of the Deposit Fund Liability calculation, suggesting that acceptance of such a calculation represents a triumph of form over substance. According to the Government's argument, UNUM's calculation of its Deposit Fund Liability oversimplifies its liability. The Government argues that while mortality and morbidity tables are not expressly considered in calculating the Deposit Fund Liability, this is a merely mechanical result of its calculation that does not reflect the Fund's true nature.

---

4. In most cases, UNUM's contracts to fund retirement benefits were with employers and established benefit plans who made their own decisions concerning the amount of contributions necessary to fulfill the goals of their retirement plans. For some benefit plans, however, UNUM contracted to assist the contract holder in computing the contributions required to fund its plan. In these so-called "Full Service contracts," UNUM performed all the actuarial services, administration, record keeping, and compliance required by the plan UNUM established for the contract holder. Approximately seven percent of the total interest credited to all contracts for the Deposit Fund Liability was for Full Service contracts.

5. The typical provision determining the load is the installment payout over five years at an interest rate reduced by two percent. This load is calculated as:

Load = 2% × [5/6 + (4/5 × 5/6) + (3/4 × 4/6) + (2/3 × 3/6) + (1/2 × 2/6) ] = 5%

This load would thus equal five percent, which would be the percentage kept by UNUM of the ending fund balance. Expressed another way, UNUM's Fund liability for this particular contract would be ninety-five percent of the ending fund balance.

The plain meaning of Code section 801(b), however, requires nothing more than mechanical compliance with its terms. Code section 801(b) defines life insurance reserves very clearly as "amounts ... which are computed or estimated on the basis of recognized mortality or morbidity tables...." Defendant concedes that the mechanical computation of the Deposit Fund Liability does not consider mortality or morbidity tables, but argues that UNUM considers mortality and morbidity factors in determining its actual liability under the contracts.[6] Courts addressing the definition of life insurance reserves, however, have focused on the mechanical computation of the reserve amount. *See, e.g., Group Life Insurance Co. v. U.S.*, 660 F.2d 1042 (5th Cir.1981), *reh'g denied*, 667 F.2d 92 (5th Cir.), *cert. denied*, 457 U.S. 1132, 102 S.Ct. 2958, 73 L.Ed.2d 1349 (1982); *Mutual Benefit Life Insurance Co. v. Commissioner*, 488 F.2d 1101 (3d Cir. 1973), *cert. denied*, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974); *Union Mutual Life Insurance Co. v. U.S.*, 420 F.Supp. at 1181.

The Court concludes that UNUM's simple computation of its Deposit Fund Liability did not take into account established morbidity or mortality tables. Because each part of the Code section 801(b) definition of life insurance reserve must be met, the Court finds that the Deposit Fund Liability is not a life insurance reserve as this term is defined in section 801(b). The Deposit Fund Liability accordingly cannot be a pension plan reserve as this term is defined in Code section 805(d). Therefore, UNUM was entitled to deduct all amounts it actually paid, in interest to the Deposit Funds under the contracts, in the determination of its nontaxable investment income under Code section 805(a)(3).[7]

## III. CONCLUSION

The affidavit of Ronald J. Albert, Assistant Tax Director and Second Vice–President at UNUM, admitted into evidence as Plaintiff's Exhibit 14, calculates the damages due to UNUM upon a ruling in its favor by this Court. Paragraph 11 of the affidavit states:

> The following calculations reflect the tax overpayments, assessed interest, and total due to us if we prevail. I performed the calculations for the amount of tax; upon information and belief, my associate, Robert Wing, performed the calculations for assessed interest.

|  | Tax | Assessed Interest | Total |
|---|---|---|---|
| 1977 | $1,377,325 | $ 890,550 | $2,267,875 |
| 1978 | 549,344 | 483,887 | 1,033,231 |
|  | $1,926,669 | $1,374,437 | $3,301,106 |

There has been no challenge made to these figures by the Government in its pleading, proof, briefing, or argument in this matter. The amount of Plaintiff's recovery is subject to no dispute.

Accordingly, it is ORDERED that judgment be, and it is hereby, granted in favor of Plaintiff in the amount of $3,301,106.00, plus interest and costs as determined by law. Judgment to enter.

**6.** The Government has argued that UNUM's obligations under the contracts may actually be higher than the figure derived from UNUM's mechanical computation of the Deposit Fund Liability, as it appears as "Deposit Administration Funds" in UNUM's 1977 and 1978 annual statements. The Government's argument is based on the fact that UNUM provides annuity purchase rate guarantees in its contracts. As the argument goes, in order for UNUM to establish the guaranteed annuity price, it has to consider mortality tables. And, if the mortality rates change in the interim period between contract origination and annuity purchase, UNUM's liability exposure for these annuities could actually be higher than that reflected by the Deposit Fund Liability. The Court finds this argument irrelevant, however, in light of the Code's clear requirement that life insurance reserves be calculated on the basis of established mortality tables. No such calculations were made in arriving at the Deposit Fund Liability.

**7.** At trial, the Court reserved decision on the admissibility of Plaintiff's Exhibit 7, which is an IRS form 886–A completed by an IRS agent who audited UNUM in 1977. The Court sustains Defendant's objection that the IRS agent's conclusion as to the law in this matter is not relevant, and finds Plaintiff's Exhibit 7 to be inadmissible for this purpose.