USAA LIFE INSURANCE CO., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 18187-88.          Filed March 26, 1990.

*Glen H. Kanwit, Richard Bromley, Michael A. Clark,* and *R. Lee Christie,* for the petitioner.
*Avery Cousins III,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioner's Federal income tax in the amounts of $391,571.79 for 1982 and $2,225,593.60 for 1983. After

---

concessions by petitioner, the principal issue for decision is (1) whether petitioner for 1983 was entitled to revalue, under section 818(c),[1] certain of the reserves that corresponded to its universal life insurance policies. If petitioner was so entitled, the issue then becomes (2) whether petitioner's computations relating to the revaluation were correct. If petitioner's computations were incorrect, the issues become (3) whether petitioner may now correct its mistakes and, if so, (4) what the correct amounts are. If it becomes necessary to resolve all of the foregoing issues, the final issue is (5) whether the portion of petitioner's universal life reserves not subject to revaluation is deductible under sections 809(d)(2) and 810(c).

The parties have stipulated that our decision for 1983, apart from the specific amounts involved, will also apply to 1982.

## FINDINGS OF FACT

Petitioner, USAA Life Insurance Co., is a Texas insurance company with its principal place of business, at the time its petition was filed, in San Antonio, Texas. Petitioner filed its Federal income tax returns for calendar years 1982 and 1983 with the Internal Revenue Service Center at Austin, Texas.

During the years at issue, petitioner was a life insurance company within the meaning of section 801(a). Petitioner was licensed to do business and did business in all 50 States and the District of Columbia.

### Universal Life Insurance

So-called "universal life" insurance policies are relative newcomers to the insurance industry, having first been issued in the United States in the late 1970s. Typical universal life insurance differs from traditional permanent insurance, known as whole life, largely in terms of its relative variability and flexibility.

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code of 1954 as amended and in effect for the years at issue, 1982 and 1983. The years at issue precede the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 211, 98 Stat. 720, which substantially amended part I of subchapter L relating to the taxation of life insurance companies.

A whole life policy ordinarily provides for a face amount of insurance that, at the time of issue, is known for the range of possible durations of the policy. Further, although whole life premiums are not necessarily level over the life of the insured, the premium is fixed at issue relative to the face amount of coverage. Based on these predetermined values for face amount and premiums, the insurance issuer is able to fix the cash values at issue. In short, a whole life policy is normally characterized by guaranteed premiums, guaranteed death benefits, and guaranteed cash values.

Universal life insurance, in contrast to whole life, typically has flexible premiums and death benefits, and explicit interest credits, expense charges, and cost-of-insurance charges. This type of insurance allows for varying premiums that do not necessarily maintain a fixed relationship between premiums and face amount. In other words, a policyholder may be able to change the premium without changing the amount of insurance coverage or the amount of insurance may change in a different proportion than a change in premiums. At the time of issue, therefore, the amount of insurance and the premiums are unknown for future durations. The cash values also cannot be forecast with any certainty.

### Petitioner's Universal Life Policies[2]

In 1981, petitioner submitted policy specifications and an actuarial memorandum for a universal life policy to the State Board of Insurance for the State of Texas. The actuarial memorandum stated in part that "It is proposed to hold total reserves equal to the accumulated cash values of the policies." The Texas Commissioner of Insurance approved a form universal life policy for petitioner that

---

[2] Our findings of fact relating to the provisions of petitioner's universal life policies are based upon the parties' stipulations and a sample policy introduced into evidence. The parties stipulated that "Exhibit 8-H is a representative * * * [universal life] policy for both 1982 and 1983." Exhibit 8-H, however, contains two sample policies. The first is titled "Universal Life Insurance Policy" and has a form reference number of UD594-0055 8-81. The second is titled "Flexible Premium Adjustable Life Insurance Policy" and has a form reference number of AL594-0054 2-82. Petitioner's response to respondent's Request for Production of Documents suggests that the second policy was issued in States not permitting use of the term "universal life." There are, however, approximately 20 wording differences between the two policies, some of which go well beyond mere semantics. Because the parties' stipulation, quoted in part above, leaves little doubt that the intended "representative" policy is that numbered UD594-0055 8-81, we have disregarded the provisions of the second policy in the exhibit.

same year. In 1982, petitioner began selling universal life policies and, by the end of the year, had issued about 1,500 policies with an aggregate face amount of approximately $100 million. The following year, 1983, petitioner issued about 7,000 universal life policies with an aggregate face amount of approximately $513 million.

The death benefit in a universal life policy issued by petitioner was originally computed under one of two possible options. Under one option, the death benefit was equal to the greater of (a) the face amount of the policy or (b) the cash value plus $25,000. Under the other option, the death benefit was equal to the face amount plus the cash value. After issuance, a policyholder was permitted to change the death benefit option or the face amount, subject to evidence of insurability for a death benefit increase.

Petitioner later modified the death benefit provisions, intending that any death benefit paid would be excluded from gross income under section 101(f), as added by the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, sec. 266, 96 Stat. 547. Under the first option, the death benefit became the greater of the face amount or the minimum amount required to qualify as excludable under section 101(f). Similarly, under the second option, the death benefit became the greater of the face amount plus the cash value or the minimum amount required to qualify as excludable under section 101(f).

Petitioner's universal life policies provided a formula for the monthly calculation of a cash value. This cash value affected not only the death benefit, but also the amount a policyholder received upon surrender of the policy and the amount a policyholder could borrow against the policy. Under this formula, greatly simplified, the last computed cash value was increased by premiums received and interest credited, and decreased by the cost-of-insurance charge and guaranteed expense charges.

The guaranteed expense charges were equal to 3 percent of premiums received, plus a $50 front-end charge per policy that was assessed in equal monthly amounts over the first 12 months of the policy. Interest was guaranteed to be credited to the cash value at an annual rate of at least 4½ percent, compounded annually. The policies, however, al-

lowed petitioner to credit interest in excess of this guaranteed rate, which petitioner did throughout 1982 and 1983. Cost-of-insurance charges were guaranteed not to exceed those based on the 1958 Commissioners Standard Ordinary (CSO) mortality table. The policies, however, allowed petitioner to charge a lesser amount, which it did during 1982 and 1983.

Petitioner's universal life policyholders generally made "Planned Periodic Premium Payments" in accordance with a schedule in the policy instead of treating the policy as a single-premium investment or insurance contract. Premiums paid in accordance with petitioner's recommendations were intended to supply insurance protection, based on the death benefit selected, for the life of the insured to age 95, at which point the policy would terminate and the cash value would become payable to the policyholder. Petitioner's sales personnel recommended that planned premiums be equal to the premiums charged for participating whole life policies of comparable face amount and age at issue, and that the minimum planned premium be equal to two-thirds of the recommended planned premium.

With petitioner's consent, a policyholder could increase the amount or change the frequency of scheduled premium payments. In addition, a policyholder generally could make unscheduled premium payments, subject to petitioner's right to limit their number and amount.

Assuming that a policyholder complied with the terms of the universal life policy, petitioner had a contractual obligation to accept and apply premium payments as detailed in the policy. On the other hand, as with any insurance policy, petitioner's universal life policyholders did not have a contractual obligation to make any premium payments. Moreover, if payments were discontinued, petitioner was obligated to provide renewable monthly term insurance coverage for so long as the cash value of the policy, less any offsetting indebtedness, was sufficient to cover the monthly cost-of-insurance charges and the remaining monthly assessments, if any, of the $50 front-end charge.

As required by the applicable law for the State of Texas and other States, petitioner's universal life policies allowed a policyholder to receive the cash value if the policy was

surrendered to petitioner before its termination. If a policy-holder made only a partial surrender, then only a part of the cash value was paid. Although petitioner charged no fee for a total surrender, thus making the cash surrender value in such a case equal to the cash value computed under the formula in the policy, petitioner did charge a fee for each partial surrender.

*Traditional Reserve Principles*

State insurance authorities monitor the ongoing solvency of life insurance companies to ensure that the companies can meet the long-term obligations under their policies. The States, consistent with this regulatory function, establish requirements for minimum reserves. These minimum reserves, sometimes referred to as statutory reserves, appear as liabilities on the balance sheets filed annually by such companies with State regulators.

Some version of the Standard Valuation Law generally serves as the foundation for State reserve valuation requirements, including those of Texas. For a given policy or set of policies, a reserve has traditionally been based on a mortality assumption, an interest assumption, and a reserve valuation method. The assumptions and reserve method taken together determine the net valuation premiums, or net premiums, used to calculate and fund the reserve.

Under traditional reserve valuation methods, at the time a policy is issued the present value of the net premiums is equal to the present value of future benefits under the policy. At any time after issuance, a reserve calculated prospectively will be equal to the present value of future benefits less the present value of the future net premiums. A retrospective reserve, the calculation of which looks backward from the time of valuation, is equal to a prospective reserve calculated on the same policies and assumptions.

Because of their differing uses and calculation assumptions, net premiums are generally not equal to gross premiums, which are the amounts actually paid by policyholders. The difference between the two is sometimes referred to as "loading."

There are two basic reserve valuation methods, net level and preliminary term, the latter having several established variations.[3] The net level method generally keeps net premiums level from year to year by treating the same percentage of each gross premium as an addition to the reserve. A preliminary term method, in contrast, uses a net premium for the first policy year that is less than a net level premium and renewal net premiums that are more than a net level premium. The shortfall from a net level premium in the first year is characterized as a first-year expense allowance and the excess in renewal years is considered an amortization of that first-year expense allowance. A preliminary term reserve, although it starts slower, will eventually catch up to a net level reserve amount, generally at or before the time premium payments end.

Preliminary term methods, which produce lower first-year reserves than the net level method, developed initially, and continue to be used, to provide "surplus relief." Life insurance companies experience relatively high expenses during the first year of a policy, including medical examinations, underwriting, evaluating applications, and printing and distributing policies. If the gross premiums received from policyholders in the first policy year, less these expenses, fall below a net level premium amount, then a life insurance company using the net level method must dip into its surplus to be able to both pay the expenses and fund the reserve. A low surplus level inhibits growth by restricting the issuance of new policies. By permitting a smaller portion of the gross premium to fund the reserve, a preliminary term method makes a larger portion available for paying first-year expenses, thus diminishing the strain on surplus.

The "full" preliminary term method, as applied to life insurance policies, in effect treats the first year of the insurance contract as term insurance, with permanent insurance not beginning until the second policy year. This

---

[3]Sec. 818(c) refers to "preliminary term basis" and "net level premium basis." "Basis" in this context means "method." *Reserve Life Insurance Co. v. United States,* 226 Ct. Cl. 169, 184-186, 640 F.2d 368, 377-378 (1981). Thus, our use of the term "method" herein is not intended to represent a different concept than that in sec. 818(c). Similarly, in referring to net level reserves and methods, we omit the modifier "premium" for convenience, again not intending to differentiate sec. 818(c).

method causes a terminal reserve of zero at the end of the first year by setting the net premium equal to the cost of term insurance for that year. "Modified" preliminary term methods generally use a first-year net premium lying between the extremes of net level and full preliminary term, with the reduction from net level occurring in an organized way based on actuarial factors. The various types of modified preliminary term methods differ in the size of the first-year expense allowance and the time that lapses before convergence with a net level reserve amount. The Commissioners Reserve Valuation Method (CRVM), which was developed as part of the Standard Valuation Law, is the most commonly used modified preliminary term method in practice.

Although preliminary term methods originated primarily as an aid to small companies, these methods are used today by all sizes of life insurance companies. A life insurance company need not be suffering any surplus distress to use a preliminary term method, nor does the particular method used have to relate directly to the actual expense experience of the company.

### The NAIC Model and Net Level Reserves

Having been established before the introduction of universal life insurance, the Standard Valuation Law was not readily adaptable to universal life flexibility. During 1982 and 1983, the National Association of Insurance Commissioners (NAIC), consisting of insurance officials from all the States, was developing a standard reserving method for universal life policies based on preliminary guidelines prepared by the American Council of Life Insurance.

The NAIC adopted a Universal Life Insurance Model Regulation (NAIC model) in December of 1983 as a supplement to the Standard Valuation Law. At the time of trial, over 5 years later, Texas and a large majority of the other States still had not adopted it. Texas had considered adopting the NAIC model, but had declined to do so in large part because of the complexity of the NAIC model and its failure to mention cash values. The life and health task force of the NAIC, at the time of trial, viewed as major concerns under the NAIC model both complexity and the

possibility that cash surrender values would exceed the calculated reserve.

Article 5 of the NAIC model prescribes a CRVM reserve method for universal life policies, which petitioner intended to follow for 1982 and 1983. For each policy or grouping of policies, the CRVM reserve is computed under the NAIC model by subtracting an unamortized expense allowance from a net level reserve. The net level reserve follows from these steps:

1. Using reserve valuation assumptions for interest and mortality, calculate the net level premium (NLP). The NLP can be derived from the formula earlier noted: at the time of issue, the present value of the NLP stream is equal to the present value of future benefits under the policy.

2. Calculate the guaranteed maturity premium (GMP), which is the level gross premium that provides for an endowment at the latest possible maturity date of the policy. While conceptually similar to the NLP, the GMP differs in some notable respects. The GMP is calculated using universal life fund mechanics; the NLP uses commutation functions. The GMP is based on policy guarantees of interest and mortality; the NLP is based on valuation assumptions of interest and mortality. Finally, because the GMP is a type of gross premium, it includes a loading or expense element that the NLP omits.

3. Calculate the guaranteed maturity fund (GMF), based on the GMP. The GMF is conceptually similar to a traditional net level reserve. Computationally, the GMF at a given time is equal to the present value of future benefits plus the present value of future expense charges less the present value of the future GMP stream.

4. Determine the value r for the time of valuation, which is equal to 1 or, if less, the ratio of the accumulated value (cash surrender values in this case)[4] to the GMF.

---

[4]What we refer to as "accumulated value" is also described in the record as "policy value" and "account value." An NAIC model note states that this amount, however designated, may differ from cash surrender value:

Care should be taken not to place undue emphasis on the policy or "account" value. Very often the policy value is not directly available to the policyowner. Instead, the policy value is an intermediate step used to determine benefits actually available to the policyowner such as cash surrender values, net cash surrender values, death benefits, or maturity values.

5. Perform a policy value projection from the valuation date to the endowment date (age 95 in this case), starting with the greater of the accumulated value or the GMF. This projection incorporates policy guarantees of interest, mortality, and expense charges, and assumes that all future GMP's will be paid.

6. Calculate the value A, which is the present value of the future benefits from the projection in step 5, using valuation assumptions rather than policy guarantees.

7. Calculate the value B, which is the present value of the future NLP stream, again using valuation assumptions.

8. Finally, calculate the net level reserve, which is equal to A (from step 6) minus B (from step 7), multiplied by r (from step 4).

Although the policies in issue allowed petitioner to vary the interest rates and mortality charges that affected the formula cash values, the policy guarantees for these items— 4½ percent and 1958 CSO—were the same as the applicable reserve valuation assumptions in the NAIC model. Under these facts, then, the "valuation assumptions" and "policy guarantees" referred to in the above eight steps are equivalent. This equivalence, supplemented here with a relatively low $50 front-end charge, lack of a surrender charge, and petitioner's assumption that r equaled 1, means that petitioner's aggregate cash surrender value was roughly equal to the net level reserve calculated under the NAIC model.[5]

More specifically, the value A can be thought of as a sum of two parts. The first part is the present value of future benefits attributable to the starting amount, which starting amount from step 5 is, assuming r to be 1, petitioner's aggregate cash surrender value. The computation of this first part of A involves finding the present value (using valuation assumptions) of certain future values (computed using policy guarantees). The equivalence of valuation assumptions and policy guarantees makes this computation

---

Because petitioner charged no fee for the total surrender of a policy, for purposes of the NAIC model as applied to petitioner, these terms refer to the cash surrender values of petitioner's policies.

[5]We use the term "aggregate cash surrender value" herein to refer to the sum of the individual cash surrender values from each of petitioner's universal life policies.

end up back at its starting amount, the aggregate cash surrender value.[6]

The second part of the value A is the present value of the future benefits attributable to the future GMP stream. This second part of A is largely offset in this case by subtracted amount B because of the close relationship between their respective focal points, the GMP, and the NLP. There is not a total offset, however, because petitioner's policies each had a $50 front-end expense charge accounted for by the GMP. The present value of the future GMP stream at a given time included the unamortized portion of this $50.

Consequently, injecting petitioner's circumstances into the NAIC model, including petitioner's assumption that r was equal to 1, results in a net level reserve approximately equal to the aggregate cash surrender value plus the unamortized portion of the $50 front-end charge.

Knowing of the approximate equivalence between a net level reserve under the NAIC model and its aggregate cash surrender value, petitioner greatly simplified its 1982 and 1983 universal life reserve calculations. Instead of calculating the net level reserve as called for by the methodology in the NAIC model, which would have been difficult within the time constraints imposed by State regulators, petitioner substituted the aggregate cash surrender value of its universal life policies. As of December 31, 1983, the aggregate cash surrender value of petitioner's universal life policies was $9,136,718, although a breakdown of this total by age grouping, sex, smoker/nonsmoker, and death benefit option is no longer available because petitioner destroyed part of its relevant database in 1986. An accurate net level reserve calculated under the NAIC model was approximately $255,000 greater than this aggregate cash surrender value. The $255,000 difference was attributable to the unamortized portion of the $50 per policy front-end charge.

*The NAIC Model Expense Allowance and CRVM Reserve*

In order to arrive at the CRVM reserve under the NAIC model, an unamortized expense allowance must be sub-

---

[6]Throughout this discussion, we disregard the insignificant effects of projections done with universal life monthly fund mechanics and present values done with traditional annual commutation function mechanics.

tracted from the net level reserve. This unamortized expense allowance is equal to r (from step 4 above) multiplied by the unamortized portion of a traditional whole-life CRVM expense allowance. Petitioner's original calculations for 1983 derived an unamortized expense allowance of $3,802,632.

In calculating its unamortized expense allowance for 1983, petitioner made at least one clerical error, which related to those universal life policies issued during 1982. Specifically, by an erroneous application of the tables containing expense allowance factors, petitioner understated its unamortized expense allowance under the NAIC model by $903,086 to $1,049,002. In addition, of no or relatively insignificant effect, petitioner treated r as equal to 1. The value r would equal 1 only if the cash surrender value of almost every universal life policy was at least equal to the corresponding GMF.

As another part of its unamortized expense allowance calculation, for those policies still in their first policy year at the end of 1983, petitioner calculated an unamortized expense allowance that was considerably less than the midterminal allowance that would normally apply. A midterminal unamortized expense allowance is computed by averaging the unamortized expense allowances at the beginning and end of the policy year. Petitioner instead averaged zero and the end-of-year allowance. Petitioner's calculated unamortized expense allowance of $3,802,632 was nearly $3 million less than the number that would have resulted from the use of a midterminal allowance for all policies.

Petitioner's approach to this midterminal issue, whether an intended methodology or a clerical error, resulted in an aggregate unamortized expense allowance that was more consistent with reserve valuation principles than a pure midterminal calculation. This is because the NAIC model calls for a policy-by-policy calculation and because petitioner's policyholders typically did not make annual premium payments. With premiums on a typical policy building up gradually over the course of the first policy year, and 1983 policies being on average only 6 months old at yearend, petitioner's approximated net level reserve, or cash surrender value, for a 1983 policy at the end of 1983 was roughly half of a full policy year cash surrender value. Subtracting a

high midterminal unamortized expense allowance for each policy from its corresponding low net level reserve would have resulted in some theoretically impermissible negative reserves.

Although petitioner's approach was generally more consistent with reserve valuation principles than a standard midterminal calculation, this approach did not reasonably account for petitioner's atypical policies and policyholders. Some of the policies called for annual premium payments, rather than more frequent intervals, and some of the policyholders made unscheduled additional premium payments, called "dump-ins." If either of these factors applied to a given 1983 policy, assuming that any dump-ins were actually paid during calendar year 1983 rather than later, this would increase the calendar yearend cash surrender value from what it otherwise would be. This increased cash surrender value would in some cases be able to absorb an unamortized expense allowance higher than petitioner's calculation without creating a negative reserve. By not accounting for these atypical circumstances, petitioner understated its aggregate unamortized expense allowance by $535,084 to $785,084.

In sum, petitioner intended to reach at least a close approximation to the CRVM reserve in the NAIC model. From its aggregate cash surrender value approximation of a net level reserve ($9,136,718), petitioner subtracted an amount ($3,802,632) intended to represent the prescribed unamortized expense allowance. The result ($5,334,086) was a purported preliminary term reserve subject to revaluation under section 818(c). After the corrective adjustments described above, the net level reserve would be $9,391,718, the unamortized expense allowance would be in the range of $5,240,802 to $5,636,718, and the resulting purported preliminary term reserve would be in the range of $3,755,000 to $4,150,916.

*Texas Reserve Requirements and the Annual Statement*

The Texas State Board of Insurance monitors domestic life insurance companies, such as petitioner, more closely than those with out-of-state home offices. Under the laws, regulations, and practices of Texas, as administered by the

State Board of Insurance, the required minimum reserve relating to universal life policies is their aggregate cash surrender value, if greater than a computed reserve. Texas is not unusual in this respect. Petitioner's computed reserve, the purported CRVM reserve of $5,334,086, was less than the aggregate cash surrender value of $9,136,718, and Texas required the latter amount to be held as a statutory reserve. From the compliance perspective of a life insurance company, Texas reserve requirements take precedence over pronouncements of the NAIC that have not yet been adopted by the State. Petitioner did not request permission from the Texas regulatory authorities to hold less than an aggregate cash surrender value reserve.

For the years at issue here, all life insurance companies doing business in Texas were required to file an annual statement prescribed by the NAIC, as of December 31, and petitioner did so. Petitioner also filed this annual statement with the other States. The Texas State Board of Insurance required the minimum aggregate reserve relating to life insurance policies to be shown in exhibit 8 (titled "Aggregate Reserve for Life Policies and Contracts"), parts A through G, of the annual statement.

As already described in some detail, petitioner calculated a purported preliminary term reserve, as of December 31, 1983, by subtracting an unamortized expense allowance of $3,802,632 from an aggregate cash surrender value of $9,136,718. Petitioner reported the resulting $5,334,086 in exhibit 8, part A (titled "Life Insurance") of the 1983 annual statement, on a line petitioner labeled in part "1958 CSO ALB [Age Last Birthday] 4.5-percent CRVM." Petitioner reported the amount of $3,802,632 in exhibit 8, part G (titled "Miscellaneous Reserves") on a preprinted line labeled "For surrender values in excess of reserves otherwise required and carried in this schedule."[7] Hereinafter, these

---

[7]As of Dec. 31, 1982, petitioner calculated a purported preliminary term reserve for its universal life policies of $190,581, which resulted from an approximated net level reserve of $939,567, less an unamortized first-year expense allowance of $748,986. In its 1982 annual statement, petitioner reported the $190,581 amount in part G of exhibit 8 and reported the $748,986 amount in part A of exhibit 8. In its 1983 annual statement, petitioner reported its purported preliminary term reserve in part A of exhibit 8 and the excess cash surrender value in part G. With this one exception, petitioner used the same methods in 1982 and 1983 to compute and report its purported preliminary term reserves, its purported preliminary term expense allowances, and its reserves for tax purposes.

respective amounts will sometimes be referred to as the "exhibit 8A reserve" and the "exhibit 8G reserve."

Given petitioner's intended reserve methodology, the bifurcation of the required minimum reserve into exhibit 8A and exhibit 8G reserves was not objectionable to the Texas regulatory authorities. On the other hand, there were no Texas requirements prescribing the specific parts of exhibit 8 to use and Texas regulatory authorities would have had no objection to the aggregate cash surrender value of petitioner's policies appearing entirely in exhibit 8A. Moreover, the preprinted line in exhibit 8G reading "For surrender values in excess of reserves otherwise required and carried in this schedule" became a part of the annual statement before the introduction of planned high cash value products like petitioner's universal life insurance. Life insurance companies had traditionally used this line for surrender values that were unexpectedly excessive because of, for example, a clerical or actuarial mistake.

Petitioner's exhibit 8 presentation of its aggregate cash surrender value reserve served no significant actuarial or regulatory compliance purpose. Nor did it benefit petitioner economically, disregarding the tax consequences in issue here. Petitioner did report a total combined reserve of only $9,136,718, as opposed to the NAIC model net level reserve of $9,391,718. This surplus relief of $255,000, however, would also have been available by reporting the aggregate cash surrender value entirely in exhibit 8A.

The exhibit 8A reserve of $5,334,086 and the exhibit 8G reserve of $3,802,632 were both included in petitioner's exhibit 8 total of $244,670,962 for 1983. The first page of petitioner's 1983 annual statement contains a representation, signed by a vice president of petitioner, stating in part:

I have examined the actuarial assumptions and actuarial methods used in determining policy reserves and related actuarial items listed below, as shown in the annual statement of the Company, as prepared for filing with state regulatory officials, as of December 31, 1983.

(i) Aggregate reserve for life policies and contracts (Exhibit 8) - 244,670,962

The representation contains no more specific reference to the amounts that make up the exhibit 8 total.

*Petitioner's 1983 Tax Return*

Petitioner treated both the exhibit 8A and exhibit 8G reserves as deductions on its 1983 tax return, as follows. On its 1983 annual statement, from its exhibit 8 total of $244,670,962, petitioner subtracted the corresponding total from 1982, $182,997,429. This $61,673,533 increase for 1983 was added to petitioner's 1983 increase in accident and health policy reserves. The resulting $61,736,914 appears in the summary of operations in the annual statement as the "Increase in aggregate reserves for life and accident and health policies and contracts." Petitioner used this $61,736,914 as the starting point in a computational schedule, titled "Deduction for Increase in Reserves," attached to its 1983 Form 1120L. After various adjustments, none of which reduces the heretofore full inclusion of the exhibit 8A and 8G reserves, this schedule arrives at $58,982,377. Petitioner carried this amount directly to Form 1120L, Schedule E, titled "Gain Or (Loss) From Operations (Section 809(b))," as a deduction. The Schedule E result, after accounting for income items and other deductions, was a loss from operations of $2,888,605.

Petitioner did not treat the exhibit 8G reserve consistently on its 1983 Form 1120L. Question F in Schedule H, Form 1120L, asks in effect whether the taxpayer is a section 801(a) "life insurance company." In doing the computations necessary to answer this question, petitioner treated the exhibit 8G reserve as "life insurance reserves" defined in section 801(b). In Schedule K, Part II, which relates to foreign corporations, petitioner again treated the exhibit 8G reserve as a section 801(b) life insurance reserve and did not characterize it as a section 810(c)(3) or (c)(4) reserve.

Petitioner did not treat the exhibit 8G reserve as a section 801(b) life insurance reserve, however, in computing the "Average interest rate assumed" in Schedule B, Part II, of Form 1120L. Petitioner also did not treat the exhibit 8G reserve as a section 801(b) life insurance reserve in doing the "Adjusted life insurance reserves" computation in Schedule B, Part IV, the "Policy and other contract liability requirements" computation in Schedule B, Part VI, and the "Required interest" computation in Schedule E-1. In Sched-

ule E-1, petitioner also failed to treat the exhibit 8G reserve as a section 810(c)(3) or (c)(4) reserve.

Pursuant to a valid section 818(c) election in effect for 1982 and 1983, petitioner revalued its purported preliminary term reserve for each of these years under the approximate revaluation formula of section 818(c)(2)(A). For 1983, petitioner multiplied an "insurance in force" amount of $607,428,146 by 0.019, and then subtracted a "reserves under such contracts" amount of $97,547, resulting in a revaluation amount of $11,443,587. Petitioner claimed this revaluation amount as part of the deduction on its 1983 Form 1120L, Schedule E, which, as already described, included the exhibit 8A and 8G reserve amounts. This revaluation amount also entered into the computations of "Adjusted life insurance reserves" in Schedule B, Part IV, and "Policy and other contract liability requirements" in Schedule B, Part VI. The corresponding revaluation amount incorporated into petitioner's 1982 Form 1120L was $1,888,970.

Respondent determined that the universal life insurance reserves revalued by petitioner were not "preliminary term" reserves subject to revaluation under section 818(c) and accordingly reduced the yearend reserve balances for 1982 and 1983 by the revaluation amounts.

OPINION

The principal issue to be decided is whether petitioner was entitled to revalue its universal life insurance reserves for 1983 under the relief provisions of section 818(c). The parties have agreed that our conclusion with respect to 1983 controls the same issue as to 1982.

Petitioner computed a purported preliminary term reserve by reference to the aggregate cash surrender value of its universal life policies, $9,136,718, which was the minimum reserve amount for these policies required by the State of Texas. Using that figure as the net level reserve, petitioner, proceeding under the NAIC model formula, subtracted $3,802,632 as an unamortized expense allowance and arrived at $5,334,086, which petitioner contends is a preliminary term reserve. On its 1983 annual statement filed with Texas and the other States, petitioner divided the total required

reserve of $9,136,718 into two parts: (1) The exhibit 8A reserve ($5,334,086), designated as a CRVM preliminary term reserve, and (2) the exhibit 8G reserve ($3,802,632), described as a miscellaneous reserve "For surrender values in excess of reserves otherwise required and carried in this schedule."

Petitioner here maintains that it was entitled to revalue its $5,334,086 exhibit 8A reserve amount by adding thereto, for tax purposes only, $11,443,587 pursuant to section 818(c)(2). In addition to claiming a deduction for this revalued total of $16,777,673, petitioner claimed a deduction for the exhibit 8G reserve of $3,802,632. Thus, petitioner would invoke section 818(c) to more than double the applicable deduction to which it would be entitled under the net level reserve method, $9,391,718.[8]

Respondent does not contend that, as a general proposition, a recognized preliminary term method is nonexistent for universal life policies. Respondent does not even question the general validity of the NAIC model in that respect. Respondent does, however, contest the effect to be given to the NAIC model as applied by petitioner to its universal life policies. Respondent asserts that petitioner actually had a section 801(b) life insurance reserve consisting of the exhibit 8A reserve plus the Exhibit 8G reserve. This total was essentially a net level reserve rather than a preliminary term reserve, according to respondent, thereby making petitioner ineligible for the relief provided by section 818(c), which expressly applies only to reserves "computed on a preliminary term basis."

We hold for respondent on this ground and find it unnecessary to consider his alternative contentions.

*Basic Life Insurance Company Tax Principles*

An analysis of the issue requires a summary of some of the basic principles of life insurance company income taxation.

The Life Insurance Company Income Tax Act of 1959, Pub. L. 86-69, 73 Stat. 112, the provisions of which

---

[8]We recognize that these amounts are not actually direct deductions in the computation of taxable income. With similar effect, however, they contribute to a deduction for the increase in reserves over the prior year.

generally apply to the years here in controversy, calls for the computation of taxable income under a three-phase approach. Sec. 802(b). Some courts have referred to "taxable investment income" as a phase and "gain from operations" as a separate phase. E.g., *Union Mutual Life Insurance Co. v. United States,* 570 F.2d 382, 383-384 (1st Cir. 1978); *Jefferson Standard Life Insurance Co. v. United States,* 408 F.2d 842, 844-845 (4th Cir. 1969); *UNUM Life Insurance Co. v. United States,* 709 F. Supp. 13, 14 (D. Me. 1989), affd. in part, vacated in part 897 F.2d 599 (1st Cir. 1990). This Court, however, regards each of paragraphs (1), (2), and (3) of section 802(b) as a phase. *Anchor National Life Insurance Co. v. Commissioner,* 93 T.C. 382, 412-413 (1989); *Continental Bankers Life Insurance Co. of the South v. Commissioner,* 93 T.C. 52, 60 (1989); *North Central Life Insurance Co. v. Commissioner,* 92 T.C. 254, 266-267 (1989). We are here concerned only with phase I (sec. 802(b)(1)) and phase II (sec. 802(b)(2)). The section 818(c) revaluation affects both of the relevant phases and thus the ultimate determination of taxable income.

Phase I income is equal to taxable investment income or, if smaller, the gain from operations. Sec. 802(b)(1). A percentage portion of total net investment income is regarded as the policyholders' share and, as such, is excluded from taxable investment income. Sec. 804(a)(1) and (c). The applicable percentage is determined essentially by the ratio of the company's life insurance reserves to its assets. *Commissioner v. Standard Life & Accident Insurance Co.,* 433 U.S. 148, 155-156 and n. 14 (1977).

Phase II income is equal to 50 percent of the amount by which the gain from operations exceeds taxable investment income. Sec. 802(b)(2). The gain from operations is the excess, if any, of specified income items over specified deductions. Sec. 809(b)(1). The income items include net capital gain, the gross amount of premiums, and net decreases in certain reserves. Sec. 809(b)(1) and (c). Deductions include net increases in certain reserves, sec. 809(d)(2), and these reserves include any tax relief addition resulting from a section 818(c) revaluation. Secs. 810(c)(1) and 818(c).

Higher life insurance reserves resulting from a section 818(c) revaluation will, for tax purposes, increase the

policyholders' percentage and thus tend to diminish taxable investment income. In this case, petitioner included the section 818(c) revaluation amount of $11,443,587 in the computation of the policyholders' percentage for 1983. Higher deductions for life insurance reserves resulting from a section 818(c) revaluation will also tend to lessen the gain from operations. Petitioner included the $11,443,587 revaluation amount in its computation of the gain from operations for 1983, which computation led to a section 809(b)(2) loss from operations in the amount of $2,888,605. Petitioner accordingly reported taxable income under neither phase I nor phase II for that year.

*Section 818(c) Tax Relief Provisions*

There are two basic reserve valuation methods for life insurance, net level and preliminary term, described in detail in our findings. Briefly, the net level reserve method (sometimes referred to simply as the net level method) provides a higher reserve balance in the first policy year than a preliminary term method and thus is generally favored by life insurance companies from a tax standpoint. However, because of the relatively high expenses associated with a life insurance policy in its first year, a new or small life insurance company attempting to grow may drain its surplus by using the net level method. The adverse surplus effects can be avoided, or at least diminished, by use of a preliminary term method. By using a preliminary term method, however, a growing company may forgo a larger deduction available to those companies able to use the net level method.

Section 818(c), enacted as part of the Life Insurance Company Income Tax Act of 1959, *supra,* provides generally for an equalizing of the tax consequences between the net level method and a preliminary term method:

SEC. 818(c). LIFE INSURANCE RESERVES COMPUTED ON PRELIMINARY TERM BASIS.—For purposes of this part (other than section 801), at the election of the taxpayer the amount taken into account as life insurance reserves with respect to contracts for which such reserves are computed on a preliminary term basis may be determined on either of the following bases:

(1) EXACT REVALUATION.—As if the reserves for all such contracts had been computed on a net level premium basis (using the same mortality assumptions and interest rates for both the preliminary term basis and the net level premium basis).

(2) APPROXIMATE REVALUATION.—The amount computed without regard to this subsection—

(A) increased by $19 per $1,000 of insurance in force (other than term insurance) under such contracts, less 1.9 percent of reserves under such contracts, and

(B) increased by $5 per $1,000 of term insurance in force under such contracts which at the time of issuance cover a period of more than 15 years, less 0.5 percent of reserves under such contracts.

Prior to 1982, section 818(c)(2)(A) used "$21" instead of "$19" and "2.1 percent" instead of "1.9 percent." The amended version applies to taxable years beginning after December 31, 1981, but only with respect to reserves established under contracts entered into after March 31, 1982. Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, sec. 267, 96 Stat. 550.

The corresponding regulations provide the following summary of section 818(c):

Section 818(c) permits a life insurance company issuing contracts with respect to which the life insurance reserves are computed on one of the recognized preliminary term bases to elect to revalue such reserves on a net level premium basis for the purpose of determining the amount which may be taken into account as life insurance reserves for purposes of part I, subchapter L, chapter 1 of the Code, other than section 801 (relating to the definition of a life insurance company). * * * [Sec. 1.818- 4(a), Income Tax Regs.]

The legislative history of section 818(c) succinctly describes its origins, thereby providing insight regarding the specific congressional concerns and objectives that led to its enactment.

Congress recognized that the primary users of preliminary term methods were, as a general rule, the relatively small life insurance companies and described the new provision as "especially designed to benefit small and new businesses." S. Rept. 291, 86th Cong., 1st Sess. (1959), 1959-2 C.B. 770, 776-777. These companies held lower reserves than their more established counterparts in order to preserve surplus for both present operations and future growth, yet they bore a heavier relative tax burden because of lower deduc-

tions for additions to their reserves. Taxation of Income of Life Insurance Companies, Hearings Before a Subcomm. of the House Comm. on Ways and Means, 85th Cong., 2d Sess. 57-58, 59-60, 375 (1958). The rationale of the new provision was described as follows:

Some life insurance companies compute their life insurance reserves on what is called a preliminary term basis. The effect of this is to take the full agents' commissions (which are larger in the initial period of a life insurance contract) out of amounts which would otherwise be added to reserves during the first year of a contract and to add correspondingly larger amounts to reserves in later years. The effect of this is to work a hardship on insurance companies using preliminary term reserves as compared with those which use ordinary reserves, since the policy and other contract liability requirements which determine the policyholders' and life insurance company's shares of investment income depend on the size of the reserves. Moreover, premium additions to reserves, deductible under phase 2, also would in some cases be smaller. To avoid this result, life insurance companies which have computed their reserves on a preliminary term basis are permitted to recompute their reserves on a net level premium basis. This can be done either by an exact revaluation of the reserves to a net level premium basis or by approximating this result under a formula set forth in the bill. [S. Rept. 291, *supra*, 1959-2 C.B. at 792. See also H. Rept. 34, 86th Cong., 1st Sess. (1959), 1959-2 C.B. 736, 748.]

As explained by this Court in *National Savings Life Insurance Co. v. Commissioner*, 84 T.C. 509, 517 (1985):

The revaluation allowed under section 818(c) increases, for tax purposes, the company's reserves computed using a preliminary term method to a level equal to or approximating such reserves as computed under the net level premium method, thus allowing the electing company both the financial benefits of preliminary term reserve valuation and the tax benefits of net level premium reserve valuation.

*Petitioner's Use of the Net Level Reserve Method*

The relief provisions of section 818(c) by their terms are available only "with respect to contracts for which * * * reserves are computed on a preliminary term basis." In our view, petitioner computed its universal life insurance reserves using the net level reserve method rather than a preliminary term method. Its claim to section 818(c) relief cannot, therefore, be sustained.

In describing the computation of a universal life preliminary term reserve, the NAIC model, briefly stated, contem-

plates that an insurance company will begin with the net level reserve for its policies and subtract therefrom an unamortized expense allowance. Only the remainder will be considered a preliminary term reserve and only a preliminary term reserve may be revalued under section 818(c). In this case, petitioner used the State-mandated reserve of $9,136,718 as its beginning point, subtracted an unamortized expense allowance of $3,802,632, and arrived at a preliminary term reserve of $5,334,086. Petitioner seeks to revalue this purported preliminary term reserve.

Petitioner was, however, entitled to, and did, deduct the full amount of its State-mandated reserve of $9,136,718. It deducted the $5,334,086 as a preliminary term reserve and the remainder as a reserve for excess cash surrender value. As we shall discuss, this full amount was a section 801(b) life insurance reserve, deductible under sections 809(d)(2) and 810(c)(1). Petitioner cannot convert part of what amounts to a net level reserve into some other kind of reserve by dividing it into two parts. Because petitioner approximated its net level reserve as the aggregate cash surrender value of its policies and the full amount thereof was a deductible life insurance reserve, petitioner did not compute its life insurance reserves for its universal life policies on a preliminary term basis within the meaning of section 818(c).

The fact that petitioner divided its total $9,136,718 reserve on its annual statement carries no substantive weight. The State insurance authorities are concerned mainly with the solvency of a life insurance company, i.e., its ability to meet its policy obligations when they come due. The insurance authorities did not require petitioner to divide the aggregate cash surrender value into the exhibit 8A and 8G segments. That petitioner had set aside a sum equal to the aggregate cash surrender value of its policies, whether in exhibit 8A alone or in exhibits 8A and 8G together, satisfied the authorities' concerns.

In fact, petitioner's position on the characterization of the exhibit 8G reserve, as within or without section 801(b), was not consistent. For example, section 801(a) defines a life insurance company entitled to the special tax treatment accorded by subchapter L of the Code as having, among

other things, life insurance reserves plus unearned premiums and unpaid losses comprising more than 50 percent of total reserves. As pointed out in our findings, petitioner's income tax return for 1983 shows that the full amount of $9,136,718 was treated as part of its life insurance reserves for purposes of responding to a question whether petitioner met the section 801(a) definition of a life insurance company. In other places in the return, petitioner respected the bifurcation of the $9,136,718 amount.

Further, given the legislative history of section 818(c), to permit petitioner to treat part of its net level reserve as a preliminary term reserve would subvert the preliminary term reserve principles on which Congress relied in enacting section 818(c).

Preliminary term methods developed originally to provide surplus relief from the strain of high expenses during the first policy year, and thus met a need that was independent of tax consequences. "The preliminary-term method is used, not for any reason having to do with avoidance of taxes, but for real business purposes." *National States Insurance Co. v. Commissioner*, 758 F.2d 1277, 1278 (8th Cir. 1985), affg. 81 T.C. 325 (1983). As is apparent from the legislative history discussed above, Congress understood the origins of the preliminary term concept and believed that the factors that spawned the concept were still applicable in 1959. As is also apparent from the legislative history, section 818(c) was intended to give those life insurance companies using a preliminary term method tax consequences comparable to those using the net level method. S. Rept. 291, *supra*, 1959-2 C.B. at 823-824.

Congress did not intend to limit the application of section 818(c) to small companies. S. Rept. 291, *supra*, 1959-2 C.B. at 777. Further, the approximate revaluation of section 818(c)(2) may provide relief in excess of an exact net level reserve. See H. Rept. 98-432 (Part 2), at 1412 (1984); S. Prt. 98-169 (Vol. 1), at 538 (1984). Still, Congress plainly envisioned section 818(c) as a rough tax equalizer for those companies achieving surplus relief at the expense of a related tax hardship. *National Savings Life Insurance Co. v. Commissioner*, *supra* at 516-517; *National States Insurance Co. v. Commissioner*, 81 T.C. 325, 343 (1983), affd. 758 F.2d

1277 (8th Cir. 1985); *Beneficial Life Insurance Co. v. Commissioner,* 79 T.C. 627, 648-649 (1982); *American General Life & Accident Insurance Co. v. United States,* (M.D. Tenn. 1989). 90-1 USTC par. 50,010.

Because a preliminary term reserve is a modification to a net level reserve, and because reserves and surplus are inversely related, the measure of surplus relief in this context is the difference between a net level reserve and the reserve actually maintained under a preliminary term method. The net level reserve under the NAIC model for petitioner's universal life policies at the end of 1983 was $9,391,718 (after correcting for the $255,000 difference from aggregate cash surrender value). As stated, the purported preliminary term reserve computed by petitioner was $5,334,086, suggesting surplus relief of over $4 million. Texas and the other States, however, required petitioner's universal life reserve to equal at least the aggregate cash surrender value of the policies, or $9,136,718. Therefore, the actual surplus relief was only $255,000 and petitioner does not contend otherwise.

This $255,000 does not represent the type of surplus relief that Congress had in mind in enacting section 818(c). Petitioner's surplus relief is not computed as the net level reserve less the calculated preliminary term reserve, but is instead equal to the net level reserve less a State-imposed minimum. In other words, the Texas regulatory authorities did not respect petitioner's preliminary term computation in a way that effectuated the surplus relief inherent in preliminary term methods. As noted in our findings, Texas declined to adopt the NAIC model in part because of its failure to mention, and thus presumably to account for adequately, cash values. Texas merely permitted petitioner to set up a reserve somewhat smaller than a net level reserve. Although not clear from the record, the Texas authorities apparently would have accepted this same reserve amount even if petitioner had not purported to apply the NAIC model.

In addition, this $255,000 of surplus relief is insignificant in amount compared to not only the net level reserve, but also to the surplus relief that would result without a

State-imposed minimum reserve. The surplus relief without such State intervention would be over $4 million, using petitioner's original computations, and over $5 million after adjusting for petitioner's errors. One of petitioner's experts testified without contradiction that prior to the 1960s it was rare, and also considered a mistake, for traditional life insurance to have cash values exceeding reserves. Thus, at the time of the section 818(c) enactment in 1959, Congress apparently targeted the typical situation in which a computed preliminary term reserve provided dollar-for-dollar surplus relief. Petitioner, however, is claiming well under 10 cents of surplus relief for every dollar of difference between the net level reserve and the computed preliminary term reserve.

Congress intended section 818(c), as we have observed, to place preliminary term reserves and net level reserves on comparable footing tax-wise. *National States Insurance Co. v. Commissioner,* 81 T.C. 325, 343 (1983), affd. 758 F.2d 1277 (8th Cir. 1985); *Beneficial Life Insurance Co. v. Commissioner, supra* at 648-649; *American General Life & Accident Insurance Co. v. United States,* 90-1 USTC par. 50,010 at 83,035-83,036. Petitioner takes its 1983 revaluation amount of $11,443,587 and injects this additional section 801(b) life insurance reserve into both its phase I and phase II computations. If petitioner had actually maintained a net level reserve, then $9,391,718 would have entered into its taxable income calculations. By maintaining a mere $255,000 less than the net level reserve, petitioner seeks to use a deemed net level reserve under section 818(c) in order to replace a deduction of under $10 million with a deduction exceeding $20 million. Petitioner seeks to parlay an insignificant shortfall from a net level reserve into a tax windfall.

In an analysis somewhat similar to the "equal footing" congressional purpose that underlies section 818(c), petitioner argues that it should not be denied the revaluation deduction, in the gain from operations calculation, available to companies that are "less generous" to their policyholders. These less generous companies (represented by hypothetical "Company X"), with universal life cash surrender values no greater than computed preliminary term reserves, are clearly entitled to a section 818(c) revaluation, according

to petitioner's scenario. Petitioner contends that respondent is unreasonable in denying petitioner the revaluation, which denial results in *lower* overall deductions than Company X, even though petitioner has *greater* economic liabilities to its policyholders.

Because petitioner appears to make a broad policy argument here, our response assumes that the result of a section 818(c)(2) "approximate" revaluation is close to an exact net level reserve, as discussed in the legislative history and case law cited above. For this limited purpose, we thus disregard the difference between the stipulated actual net level reserve, $9,391,718, and petitioner's approximated net level reserve under section 818(c)(2), $16,777,673. If we assume, then, that the recomputed net level reserve for both Company X and petitioner is equal to $9,391,718, petitioner's point about lower overall deductions is true only to the extent of a de minimis $255,000. In effect, the additional revaluation deduction of Company X is almost totally matched by petitioner's exhibit 8G reserve deduction of $3,802,632.[9]

This does not address, of course, petitioner's implication that it is entitled to *more* of a deduction because of its generosity and enhanced economic liability. Section 818(c), however, does not deal with such matters. In petitioner's hypothetical, even though petitioner gets no additional "generosity" deduction, section 818(c) appears to do what Congress intended it to do: it substantially equalizes the tax treatment between petitioner, with high reserves, and Company X, which holds lower reserves for nontax reasons. We find nothing in the section 818(c) legislative history purporting to address specific policy benefits, generous or otherwise. "All that Congress said in section 818(c) * * * was that a life insurance company that computes its reserves on a preliminary term basis may recompute its reserves on a net level premium basis." *Reserve Life Insurance Co. v. United States*, 226 Ct. Cl. 169, 186, 640 F.2d 368, 378 (1981).

---

[9]Apart from a double-counting argument not implicated here, respondent does not dispute the deductibility of the exhibit 8G reserve in computing the gain or loss from operations.

*Section 801(b) Life Insurance Reserves*

Section 818(c) permits the revaluation of only "life insurance reserves." Petitioner argues that its only life insurance reserve relating to the universal life policies is the amount included in exhibit 8A of its 1983 annual statement, $5,334,086. This is the amount petitioner arrived at, a purported preliminary term reserve, by attempting to follow the NAIC model. Alternatively, if petitioner is required to correct its errors made in applying the NAIC model, petitioner argues that the revised preliminary term reserve is its only relevant life insurance reserve. Petitioner maintains that its exhibit 8G reserve is not a life insurance reserve for tax purposes, but is instead defined in either section 810(c)(3) or (c)(4), even though petitioner did not clearly treat it as if defined in section 810(c)(3) or (c)(4) on its 1983 tax return.

Respondent counters that the exhibit 8A and exhibit 8G reserves taken together are a life insurance reserve. The sum of $9,136,718 is the aggregate cash surrender value of petitioner's universal life policies at the end of 1983. If the exhibit 8A and exhibit 8G reserves are treated as an aggregate life insurance reserve, respondent asserts that petitioner's life insurance reserves are in essence a net level reserve, which is not eligible for revaluation under section 818(c).

The resolution of this issue depends upon the statutory definition of "life insurance reserves," the core of which appears in section 801(b)(1):

(1) IN GENERAL.—For purposes of this part, the term "life insurance reserves" means amounts—

(A) which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and

(B) which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts * * * involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies.

With exceptions not relevant here, life insurance reserves must also be required by law. Sec. 801(b)(2). Further, for amounts to be characterized as life insurance reserves, they must actually be held during the taxable year for which the

reserve is claimed. Sec. 1.801-4(a), Income Tax Regs.; *Modern American Life Insurance Co. v. Commissioner*, 92 T.C. 1230, 1248 (1989).

In light of our conclusion, discussed below, that the aggregate cash surrender value is a section 801(b) life insurance reserve, we are not compelled to decide whether either the exhibit 8A reserve or the exhibit 8G reserve standing alone is a life insurance reserve within the meaning of section 801(b). We have already stated in a related context that we are not bound, when applying section 801(b), by petitioner's exhibit 8 division of reserve amounts. We note further here that section 801(b)(1) establishes which "amounts" will be considered to be life insurance reserves, a vague reference that appears to encompass anything quantifiable. The aggregate cash surrender value is such an amount.

The parties do not dispute that the aggregate cash surrender value was required by law within the meaning of section 801(b)(2) and actually held during the relevant taxable year. Still in dispute, however, are the requirements of section 801(b)(1)(A) and (B).

*Section 801(b)(1)(A)—Computation or Estimation of Reserves*

We consider first whether petitioner's aggregate cash surrender value is an amount "computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest." Sec. 801(b)(1)(A). This analysis requires an examination of the nature of petitioner's cash surrender values, the nature of a net level reserve under the NAIC model, and, most importantly, the relationship between the two.

Petitioner's universal life policies during the years at issue provided a detailed formula for the monthly calculation of cash values. Under this formula, the last computed cash value was increased by premiums received and interest credited and decreased by a cost-of-insurance charge and guaranteed expense charges. Interest was guaranteed to be credited to the cash value at an annual rate of at least 4½ percent, compounded annually. The cost-of-insurance charge was guaranteed not to exceed a charge based on the 1958 CSO mortality table. For both interest and cost of insurance,

however, the policies allowed petitioner to grant policyholders more favorable rates than the guarantees. Petitioner in fact provided more favorable rates throughout the years at issue.

The parties agree that a net level reserve for petitioner's policies, if computed under the NAIC model, would be based on recognized mortality tables and assumed interest rates. This follows from the NAIC model defining a net level reserve as the present value of future policy benefits less the present value of future net level premiums, multiplied by the ratio (denoted as r) of cash surrender values to the GMF if the ratio is less than 1. The present value calculations use valuation assumptions for interest (4½ percent) and mortality (1958 CSO) that indisputedly meet the definitions of recognized mortality tables and assumed interest rates. Even assuming that the ratio multiplier is not based on recognized mortality tables and assumed interest rates, which we do not here consider, this ratio does not disqualify the net level amount from life insurance reserve status. As noted by the court in *Mutual Benefit Life Insurance Co. v. Commissioner*, 488 F.2d 1101, 1107 (3d Cir. 1974), affg. 58 T.C. 679 (1972):

> The fact that the computation for the reserve included elements other than mortality tables and assumed rates of interest, is not sufficient to disqualify the "additional reserves." There is nothing in the statute which states that these two elements are the only factors which are permissible and that all others must be excluded. In the factual context present here, we can perceive no considerations which would require us to adopt a construction of the Act so narrow as to mandate the exclusion of circumstances which would tend to make the calculation of the reserve more exact.

In any event, petitioner here assumed that r was equal to 1 for purposes of the NAIC model, an assumption that respondent does not strongly contest, which results in no adjustment to the net level reserve present value computations.

Rather than deriving a net level reserve amount from the complex calculations required by the NAIC model, petitioner treated the aggregate cash surrender value of its universal life policies as approximately equal to that net level reserve. The parties have stipulated that the aggregate cash surren-

der value of $9,136,718 was only $255,000 less than the net level reserve that would have been computed under the NAIC model. The record does not disclose whether petitioner knew that its approximation was off by $255,000 when it performed the subsequent NAIC model calculations.

Despite the relatively close relationship, in terms of the amounts, between the aggregate cash surrender value and the NAIC model net level reserve, and despite petitioner's use of the aggregate cash surrender value as its net level reserve in computing a purported preliminary term reserve, petitioner argues that the characteristics of recognized mortality tables and assumed interest rates present in the NAIC model net level reserve are lacking in the aggregate cash surrender value. According to petitioner, cash surrender values are distinguishable in that they incorporate actual historical interest rates and mortality factors as determined at petitioner's discretion, while the recognized tables and assumed interest rates contemplated by section 801(b)(1)(A) are projection oriented and grounded in the Standard Valuation Law. See *UNUM Life Insurance Co. v. United States,* 709 F. Supp. 13, 16 (D. Me. 1989), affd. on this issue 897 F.2d 599 (1st Cir. 1990) (no mortality tables used; the liability in question was "mechanically calculated similarly to a typical bank account").

Petitioner is clearly correct that cash surrender values differ conceptually from net level reserves. For petitioner's policies, cash surrender values were historical accumulations that determined how much policyholders could borrow against their policies, how much policyholders would receive upon surrender of their policies, and what amount of death benefit would be paid. Net level reserves, on the other hand, are State-prescribed amounts, based on conservative assumptions, designed to ensure that life insurance companies will be able to meet long-term obligations under their policies.

Despite these conceptual differences, however, both the aggregate cash surrender value and the NAIC model net level reserve for petitioner's policies have the same actuarial foundation. The terminology labels that give rise to the conceptual differences are not particularly meaningful because, as we have previously noted, section 801(b)(1) deter-

mines merely which "amounts" will be considered to be life insurance reserves.

That petitioner's aggregate cash surrender value ($9,136,718) closely approximated the net level reserve under the NAIC model ($9,391,718) is far from a coincidence, as discussed above in our findings. Petitioner's policy guarantees for interest and mortality, used in both the computation of cash surrender values and relevant steps of the NAIC model, were equal to the valuation assumptions used in the NAIC model. Moreover, petitioner charged no surrender fee for the total surrender of one of its policies. Because of these factors, petitioner's aggregate cash surrender value that enters the NAIC model as an input for a policy value projection leaves the NAIC model, after a mere $255,000 adjustment, as the output of the net level reserve calculation.

In sum, the NAIC model methodology leading to a net level reserve invokes present value calculations based on valuation assumptions for interest and mortality. The parties accordingly agree that the net level reserve resulting from this methodology is based on recognized mortality tables and assumed interest rates. The aggregate cash surrender value, when adjusted upward by $255,000, results from this same methodology and, as such, is a specific "amount" that is computed "on the basis of recognized mortality * * * tables and assumed rates of interest." Sec. 801(b)(1).

The necessity of a $255,000 upward adjustment to the aggregate cash surrender value may suggest that the aggregate cash surrender value without the adjustment is not the "amount" that satisfies section 801(b)(1)(A). We do not believe, however, that this $255,000 discrepancy taints the status of the aggregate cash surrender value. The amount of the discrepancy is insignificant relative to the aggregate cash surrender value and, as is evident from the phrase "computed or estimated," section 801(b)(1)(A) does not mandate absolute precision in its application. *Central National Life Insurance Co. of Omaha v. United States,* 216 Ct. Cl. 290, 314-315, 574 F.2d 1067, 1081 (1978). The parties agree that petitioner's aggregate cash surrender value was a reasonable approximation to the NAIC model net level

reserve. Indeed, in the words of petitioner's trial memorandum, with "UL" meaning "universal life"

Step one [of the NAIC model] was to determine a net level reserve for the UL policies outstanding at the end of 1983. The company used its UL policy cash values as an approximation of a net level reserve. Given the specific characteristics of * * * [petitioner's] UL policies, this approximation ($9,136,718) was not materially different from an exact net level reserve, being less than 3 percentage points from an actual net level reserve calculation.

Furthermore, an amount may be systematically adjusted from a strict application of recognized mortality tables and assumed interest rates and still be considered a life insurance reserve under section 801(b)(1)(A). *Mutual Benefit Life Insurance Co. v. Commissioner, supra* at 1107; *Lincoln National Life Insurance Co. v. United States,* 217 Ct. Cl. 515, 533-534, 582 F.2d 579, 593 (1978). The parties agree that the $255,000 amount consists solely and entirely of the unamortized portion of the $50 front-end expense charge. The systematic derivation of the $255,000 amount does not impair the direct link between the aggregate cash surrender value and the recognized mortality tables and assumed interest rates of the net level reserve.

A case to be distinguished in this regard is *Central National Life Insurance Co. of Omaha v. United States, supra.* The taxpayer there argued that its reserves computed by the gross unearned premium reserve method were estimates based on the requisite "tabular factors." The gross unearned premium reserve was derived from the gross contract premium and reflected the fact that only a portion of the policy year had expired. In constructing the contract premium, the taxpayer's actuary had to take into account mortality factors and interest discounts. The court rejected the argument:

Although the tabular factors thus may be said to underlie the gross unearned premium reserve, it does not follow that the reserve itself is "estimated on the basis of" the tabular factors. In the estimating process, the reserve is not derived from a direct application of mortality * * * factors and interest discounts. [216 Ct. Cl. at 314, 574 F.2d at 1081.]

The court acknowledged a relationship between the purported reserve and the tabular factors, but the link was not direct and quantifiable as it is in the instant case.

The court went on to hold that the taxpayer's reserve was appropriately "estimated" within the meaning of section 801(b)(1)(A). 216 Ct. Cl. at 314-315, 574 F.2d at 1081. The taxpayer used the gross unearned premium method as a means to approximate the reserve that would have been produced by precise calculations based on recognized mortality tables and assumed interest rates. Petitioner's circumstances here are similar in that petitioner used the aggregate cash surrender value to approximate what would have been produced by more precise actuarial computations.

We find that the aggregate cash surrender value of petitioner's universal life policies at the end of 1983 satisfied section 801(b)(1)(A).

*Section 801(b)(1)(B)--Future Unaccrued Claims, Life Contingencies*

Section 801(b)(1)(B) provides that amounts will only be considered life insurance reserves if the amounts "are set aside to mature or liquidate * * * future unaccrued claims." Petitioner maintains that the aggregate cash surrender value cannot meet this standard because a cash surrender value is a present, accrued liability, in the nature of a demand deposit.

The preceding analysis of section 801(b)(1)(A) indicates that we will not attach undue significance to labels and that petitioner's aggregate cash surrender value was in essence a net level reserve. Further, even petitioner's expert witnesses agreed that a net level reserve under the NAIC model meets the requirements of section 801(b), including the section 801(b)(1)(B) provisions. Nonetheless, we address petitioner's argument as petitioner has framed it. Our conclusion serves to reinforce our view that the aggregate cash surrender value is a section 801(b) life insurance reserve.

A cash surrender value is admittedly in some sense like a typical demand deposit of a financial institution, a customer savings account. For both, contributed funds accumulate at interest and are subject to withdrawal upon demand. A meaningful difference, however, which sheds light on when a

cash surrender value may be considered accrued for purposes of section 801(b)(1)(B), is that the cash surrender value described in petitioner's policies is available to a policyholder with no further policyholder obligations only upon a surrender of the policy and its attendant insurance benefits.

Although neither the Internal Revenue Code nor the regulations define "future unaccrued claims" for purposes of section 801(b)(1)(B), accrued claims are described elsewhere in subchapter L. In section 809(d)(1), a deduction is allowed in computing the gain or loss from operations for "All claims and benefits accrued." Included within this phrase are death benefits and cash surrender benefits. *Modern American Life Insurance Co. v. Commissioner*, 92 T.C. 1230, 1243 (1989). The regulations corresponding to section 809(d)(1) provide that "The term 'all claims and benefits accrued' includes, for example, * * * amounts allowed on surrender." Sec. 1.809-5(a)(1), Income Tax Regs. Anticipated death benefits prior to the death of the insured are clearly "future unaccrued claims" for purposes of section 801(b)(1)(B). The linking of death benefits and "amounts allowed on surrender" in section 809(d)(1) suggests that cash surrender values not yet demanded are also "future unaccrued claims."

The importance of actual policy surrender is also apparent in the NAIC annual statement form as interpreted by the parties, despite their disagreement about how petitioner's aggregate cash surrender value should have been presented in exhibit 8. Petitioner contends that a split between exhibit 8A and exhibit 8G is correct. Respondent argues that the entire amount should be shown in exhibit 8A. There is no disagreement, however, that the aggregate cash surrender value, prior to surrender of the policies, must appear in the exhibit 8 total. Under the express cross-references of the annual statement form, the exhibit 8 total carries to the balance sheet, specifically to a line in the liabilities portion labeled "Aggregate reserve for life policies and contracts." The change in this balance sheet amount from the prior year is included in the summary of operations, which is the life insurance company version of a profit and loss statement.

When a policyholder surrenders a policy and is paid the cash surrender value, the surrender benefits, like death benefits, also flow to the summary of operations. The surrender amount paid appears in a supplementary exhibit of the annual statement, on a line labeled "Surrender values." See C. Beardsley, P. Chapman, H. Harkey & H. McFarland, Life Company Annual Statement Handbook 7-48, 7-53 (1988 ed.); Batchelder, "Benefits for Policyowners," Life Insurance Accounting 203-224 (1977). Cash values a company has been unable to pay on surrendered policies for various reasons appear as a balance sheet liability labeled "Surrender values on cancelled policies." See C. Beardsley, *supra* at 7-198; Batchelder, *supra* at 216; J. Noback, Life Insurance Accounting 128 (1969). The cash value amount paid, from the supplemental exhibit, is added to the change from the prior year in the amount unable to be paid, and the result enters the summary of operations as "Surrender benefits." See C. Beardsley, *supra* at 7-217, 7-220; Batchelder, *supra* at 222; J. Noback, *supra* at 215.

Accordingly, for annual statement purposes cash surrender values are treated much like death benefits and their associated reserves. Regardless of which is higher, total cash surrender values or a computed preliminary term reserve, the larger encompasses the smaller and, prior to the triggering event of death or surrender, appears in exhibit 8. This amount flows first to the balance sheet of the annual statement and then, after comparison to the prior year amount, to the summary of operations. Upon death or surrender, payments to a beneficiary or policyholder become deductions in computing the gain or loss in the summary of operations.

Petitioner suggests that actual surrender of the policy is not a pivotal event by arguing that the "all events test" does not apply in this context. Section 1.461-1(a)(1), Income Tax Regs., provides that "Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy." We find it unnecessary to address the implications of the all events test, however, because petitioner's cited case authority on this point is

inapposite. Both *Bituminous Casualty Corp. v. Commissioner,* 57 T.C. 58, 82 (1971), and *Lincoln National Life Insurance Co. v. United States,* 217 Ct. Cl. at 550-551 n. 16, 554, 582 F.2d at 599 n. 16, 601, consider the treatment of retrospective rate credits and neither purports to define the relationship between the all events test and "future unaccrued claims" in section 801(b)(1)(B).

In summarizing why cash surrender values are not "future unaccrued claims," petitioner states on brief that "the treatment of * * * [petitioner's] liabilities to its policyholders depends upon industry practice, NAIC accounting, and the technical provisions of subchapter L," citing section 818(a). Without deciding whether petitioner's summation is correct, we note that both NAIC accounting and the subchapter L provisions indicate that cash surrender values *are* future unaccrued claims until surrender of the policy. Moreover, petitioner has directed us to no industry practice that suggests otherwise. In our view, petitioner's State-required reserve equal to the aggregate cash surrender value is an amount set aside for future unaccrued claims.

Apart from the issue of whether cash surrender values are future unaccrued claims, the parties have a fundamental difference of opinion about how the words of section 801(b)(1)(B) relate to one another. The controversy concerns:

*future unaccrued claims arising from life insurance,* annuity, and noncancellable health and accident insurance *contracts * * * involving,* at the time with respect to which the reserve is computed, *life,* health, or accident *contingencies.* [Sec. 801(b)(1)(B). Emphasis added.]

Respondent suggests a reading of the provision that avoids a direct connection between "future unaccrued claims" and "life contingencies." Respondent essentially argues that the future unaccrued claims in question must arise from life insurance contracts and that those life insurance contracts must involve life contingencies at the time the reserve is computed.[10] Petitioner's interpretation is

---

[10]Subchapter L, as applicable to the years in issue, does not define "life insurance contract." *Aetna Life Insurance Co. v. United States,* 16 Cl. Ct. 364, 376 n. 20 (1989). Sec. 1035, however, defines "a contract of life insurance" as a contract with a life insurance company which depends in part on the life expectancy of the insured, and which is not ordinarily payable in full during the life of the insured. Sec. 7702 defines "life insurance contract," but this section took effect after the years in issue. Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 221, 98 Stat. 767.

that the future unaccrued claims themselves, or the associated reserve, must involve life contingencies. Respondent has the more reasonable interpretation based on the face of the statute. See *Delta Life Insurance Co. v. United States,* 363 F. Supp. 410, 413 (E.D. La. 1973).

To support their respective positions on this point of statutory construction, both parties refer to the legislative history of section 163(a) of the Revenue Act of 1942, ch. 619, 56 Stat. 867.

The bill introduced in the House Committee on Ways and Means defined "life insurance reserves" as follows:

The term "life insurance reserves" means amounts computed or estimated on the basis of recognized experience tables with interest assumed as a factor which, with accretions from interest, are set aside to mature or liquidate, either by payment or reinsurance, *future unaccrued and contingent claims arising from life insurance contracts and noncancellable health and accident contracts.* * * * [H.R. 7378, 77th Cong., 2d Sess. 121 (1942). Emphasis added.]

The Senate bill changed this wording, and section 801(b)(1)(B), as applicable to the years here at issue, is identical to this 1942 Senate version. H.R. 7378, 77th Cong., 2d Sess. 221 (1942). A specific reason for the changed wording appears in the legislative history:

The elimination of contingent claims from the House bill is to permit the liability arising from insurance contracts providing for the payment of the proceeds in installments certain for a specified period and a continuation of their installment payments to a beneficiary so long as he might live, to be classified as a reserve if the contract involved a life contingency even if some part of the liability was held to meet noncontingent claims. * * * [S. Rept. 1631, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 504, 612.]

Petitioner seems to argue that this is the exclusive situation in which a life insurance reserve may apply to a policy benefit not dependent on a life contingency. Respondent contends that this is merely one example.

We do not here consider whether to adopt respondent's broad construction because, even if petitioner is correct that the future unaccrued claim must itself involve a life contingency, we believe that petitioner's cash surrender values qualify under that standard. As we have already noted, petitioner's cash surrender values may be considered

future unaccrued claims within the meaning of section 801(b)(1)(B) because the policyholders had yet to surrender the policies and demand the cash values. There was a life contingency involved in any such claim because the future surrender and demand was dependent on the survival of the insured to that time. If the insured died before the policyholder surrendered the policy and demanded the cash value, the policy would terminate and the death benefit would be paid to the designated beneficiary. Given that the insured and the policyholder were not necessarily the same under petitioner's universal life policies, this situation is analogous to that in *Lincoln National Life Insurance Co. v. United States, supra.* The court there found that the reserve for a beneficiary's settlement option involved a life contingency because the time that payments would begin was contingent on the death of the insured. 217 Ct. Cl. at 534-535, 582 F.2d at 590.

Petitioner directs us to two Supreme Court cases, *Helvering v. Inter-Mountain Life Insurance Co.,* 294 U.S. 686 (1935), and *Helvering v. Illinois Life Insurance Co.,* 299 U.S. 88 (1936), for the proposition that a section 801(b)(1)(B) "future unaccrued claim" cannot be a demand liability and must itself involve a life contingency. Even if this is so, we have already characterized petitioner's cash surrender values as future unaccrued claims, and not typical demand liabilities, that do involve life contingencies.

We also note the limited precedential value of these two cases. Both predate the first appearance of the predecessor to section 801(b) in the Revenue Act of 1942, *supra.* See *Group Life & Health Insurance Co. v. United States,* 660 F.2d 1042, 1056 (5th Cir. 1981). Furthermore, the litigating position of the taxpayers in those cases was very different from that of petitioner in the instant case. The companies there sought deductibility for certain reserves on the ground that, as mandated by the applicable revenue statute, they were reserves "required by law." Petitioner here, however, maintains that the exhibit 8G reserve is not a "life insurance reserve" under the applicable statute, with deductibility assumed and not in dispute. The Supreme Court itself reinforces our reluctance to rely on cases such as these:

The Government suggests that state regulatory practice cannot be deemed controlling under the doctrine of *McCoach v. Insurance Co. of North America,* 244 U.S. 585 (1917) and the many cases in this Court that followed it. See, e.g., * * * *Helvering v. Inter-Mountain Life Ins. Co.,* 294 U.S. 686 (1935). These cases held that certain reserves mandated by state insurance authorities were not reserves "required by law" within the meaning of the early revenue acts, because they were not technical insurance reserves. In those cases, however, the question was not whether the taxpayers qualified for preferential tax treatment. Rather, the question was whether the taxpayers would be allowed a deduction for additions to various reserves, and the skeletal provisions of the earlier acts necessitated a restrictive view. The same restrictive view is not appropriate for purposes of applying section 801. Moreover, those early cases generally have little bearing on questions that arise under the more recent enactments. The definition of "life insurance reserves" that now appears in section 801(b), and which originated with the 1942 Revenue Act, substantially replaced the problematic concept of technical reserves developed in *McCoach.* [*United States v. Consumer Life Insurance Co.,* 430 U.S. 725, 752-753 n. 38 (1977). Citations omitted.]

In addition to emphasizing the "little bearing" of early cases on section 801(b) questions, the Court notes that those cases did not consider "whether the taxpayers qualified for preferential tax treatment." The preferential tax treatment at issue in *Consumer Life* was that following generally from status as a "life insurance company" under section 801(a). 430 U.S. at 727-728. That issue is not before us in the instant case because the parties have stipulated to petitioner's status as a life insurance company. The Supreme Court reference does not ring any less true, however, merely because petitioner seeks more specific preferential tax treatment, a section 818(c) revaluation, within subchapter L.

Regardless of their precedential value, we find the results of petitioner's cited cases readily distinguishable. In *Helvering v. Inter-Mountain Life Insurance Co., supra,* the policies in question, which called for 20 annual premium payments, bore 19 coupons that matured serially on policy anniversary dates. *Helvering v. Illinois Life Insurance Co., supra,* involved "survivorship investment funds." The policies called for 20 annual premiums and the company set aside a portion of each to accumulate at interest in the survivorship investment fund. In both of these cases, the disqualified reserve amount was practically and conceptually severable from the life insurance protection. In contrast to petition-

er's universal life policyholders, the *Inter-Mountain Life* policyholders could withdraw the cash attributable to matured coupons without affecting the separate insurance coverage. 294 U.S. at 688. In *Illinois Life,* similarly, at the end of 20 years the insured could receive a cash payment of the survivorship investment fund without impairing the ongoing insurance protection of a then paid-up policy. 299 U.S. at 90.

## *Application of Section 810(c)(3) to the Exhibit 8G Reserve*

Petitioner argues further that Congress could not have intended section 801(b)(1)(B) to encompass the portion of petitioner's aggregate cash surrender value that makes up the exhibit 8G reserve because this situation is addressed elsewhere. Petitioner refers specifically to section 810(c)(3), which reads in pertinent part: "The amounts * * * necessary to satisfy the obligations under insurance * * * contracts (including contracts supplementary thereto), but only if such obligations do not involve * * * life, health, or accident contingencies."

We believe that petitioner's aggregate cash surrender value appropriately falls within section 801(b), and consequently section 810(c)(1), and that it is inappropriate to treat a portion thereof, the exhibit 8G reserve, as within section 810(c)(3).

The cash surrender value for one of petitioner's universal life policies could not be practically or meaningfully divorced from the life insurance contract or its associated insurance protection. A policyholder did not purchase the insurance component and the excess cash surrender value component separately. In fact, the cash surrender value was not available to the policyholder, other than by means of a loan, unless the policyholder surrendered the policy and its insurance protection. Further, the cash value entered into the death benefit formula and thereby affected petitioner's net amount at risk under the policy. As another example, if premium payments stopped, the cash value until exhausted automatically funded monthly renewable term insurance. Apart from the variable death benefit in petitioner's policies, which we find an insignificant distinction in these circumstances, these characteristics are shared with tradi-

tional whole life insurance. See S. Huebner & K. Black, Life Insurance 7-8, 77-91 (10th ed. 1982); D. McGill, Life Insurance 36-38, 58-70 (rev. ed. 1967); J. Magee, Life Insurance 15-30, 355-356 (3d ed. 1958). This Court has previously expressed its disagreement with separating traditional whole life insurance into a term insurance component and an investment component for purposes of the computations in section 818(c)(2)(A) and (B). *National Savings Life Insurance Co. v. Commissioner*, 84 T.C. 509, 548 n. 28 (1985).

### Subsequent Congressional Action

Without specific regard to the definitional components of section 801(b), both parties seek to use subsequent congressional action to support their positions as to whether aggregate cash surrender value is a section 801(b)(1) life insurance reserve. The Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 211, 98 Stat. 720, completely revised the scheme for income taxation of life insurance companies after the years at issue. The new subchapter L was intended to create a simpler single-phase tax closer to the general structure of corporate income taxation. *Anchor National Life Insurance Co. v. Commissioner*, 93 T.C. 382, 412 n. 18 (1989). However, the section 801(b)(1) definition of life insurance reserves was left unchanged, except for some word ordering not relevant here, and appears as new section 816(b)(1).

The parties use this unchanged definition of life insurance reserves as the link between the two taxation schemes that permits an analytical focus on new section 807(d):

SEC. 807(d). METHOD OF COMPUTING RESERVES FOR PURPOSES OF DE-
    TERMINING INCOME.—
    (1) IN GENERAL.—For purposes of this part (other than section 816), the amount of the life insurance reserves for any contract shall be the greater of—
        (A) the net surrender value of such contract, or
        (B) the reserve determined under paragraph (2).

The "reserve determined under paragraph (2)" generally is one computed on the basis of the CRVM prescribed for that type of contract by the NAIC. Sec. 807(d)(2) and (3).

Petitioner argues that this express statutory reference to "net surrender value" is intended to supplement the general

definition of life insurance reserves, which otherwise would not include net surrender value. Because there is no comparable reference in the statutory provisions applicable to the instant case, petitioner concludes that cash surrender values exceeding a computed preliminary term reserve are not included in section 801(b) life insurance reserves. Respondent draws a different conclusion from the same statutory provisions. Respondent argues that Congress would not have provided for the "net surrender value" in the revised statute if the concept was not already embodied in life insurance reserves. According to respondent, Congress did not intend to change the definition of life insurance reserves from that in prior law, but instead meant only to limit the amounts deductible to the minimum reserves required under the prevailing law of the States.

Several factors cause us not to attempt a resolution of this particular conflict. We agree with the admonition of the Supreme Court that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States v. Price,* 361 U.S. 304, 313 (1960), quoted in *Estate of Stoll v. Commissioner,* 38 T.C. 223, 247 (1962). This is especially so here because the earlier Congress, from 1959, preceded the later one by 25 years. The passage of time lessens whatever significance there may be to the actions of the later Congress. *Mars, Inc., & Uncle Ben's, Inc. v. Commissioner,* 88 T.C. 428, 435 (1987); *National Savings Life Insurance Co. v. Commissioner, supra* at 544 n. 23 (describing the use of the legislative history of section 818(c) amendments as "hazardous" because of a 23-year time lag). Indeed, the relevant point of reference may be 1942, when the predecessor to section 801(b) first came into the Internal Revenue Code, rather than 1959.

In addition, there is presumably no specific intent to be uncovered from pre-1960 Congresses because life insurance products with cash surrender values exceeding computed statutory reserves were not common until, at the earliest, the 1960s. Finally, any inference we were to draw about section 801(b) from the words and actions of the 98th Congress would be greatly subordinate to, and could not offset, the contemporaneous views of the 86th Congress that enacted the section most directly in issue, section

818(c). We have already discussed petitioner's shortcomings in view of that legislative history.

In conclusion, we find that the minimum universal life reserve required by the State of Texas for 1983, which was the aggregate cash surrender value of petitioner's universal life policies, meets the definition of "life insurance reserves" in section 801(b). Petitioner is seeking to revalue what was in essence a net level reserve, even though section 818(c), by its express terms, applies only to life insurance reserves "computed on a preliminary term basis." As far as we can ascertain, the only consequence of petitioner's dividing the aggregate cash surrender value into an exhibit 8A reserve and an exhibit 8G reserve was to provide a foundation for petitioner's section 818(c) revaluation argument.

Based on the foregoing, we hold that petitioner for 1983 was not eligible for a section 818(c) revaluation relating to its universal life insurance policies. Although our findings unavoidably make reference to petitioner's computational errors, our conclusion on the principal issue in this case makes it unnecessary to consider in detail the issues, including computational errors and the effect thereof, that may follow from a contrary conclusion.

*Decision will be entered for the respondent.*